UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:21-CV-00055-GNS-HBB

DANA LITTLE                                                          PLAINTIFF

v.

CITY OF OWENSBORO, KENTUCKY, et al.                 DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (DN 78); Defendants' Motion for Summary Judgment (DN 82); and Defendants' Motions to Exclude (DN 79, 80). The motions are ripe for adjudication.

## I.    BACKGROUND

Dana Little ("Dana") and Keon Little ("Keon") filed this lawsuit against the City of Owensboro, Kentucky ("City"), Art Ealum ("Ealum"), and Wesley Dunn ("Dunn") (collectively, "Defendants") on May 20, 2021.[1] (*See* Compl., DN 1). During the events underlying this action, Ealum and Dunn were police officers employed by the Owensboro Police Department ("OPD"), with Ealum serving as the Chief of OPD. (Dunn Dep. 4:16-20, Apr. 11, 2023, DN 77-1; Ealum Dep. 7:1-6, Nov. 30, 2023, DN 84-1). This lawsuit arises from an interaction that occurred in front of Dana's home on the morning of May 26, 2020, in which OPD was called to intervene in an

---

[1] Subsequently Dana and Keon moved to voluntarily dismiss all claims asserted by Keon, as a guilty plea to disorderly conduct in state court rendered his claims moot. (Pls.' Mot. Voluntary Partial Dismiss, DN 56). Dana also submitted a proposed order dismissing all claims against another Defendant, M. Hammonds ("Hammonds"). (Proposed Agreed Order Partial Dismissal, DN 58). This Court granted both requests, and both Keon and Hammonds have been removed as parties. (Agreed Order Partial Dismissal, DN 59).

altercation between Dana, Keon, and an individual named Justin Kyle ("Kyle").  (D. Little Dep. 16:22-17:1, 21:1-8, 26:9-20, Apr. 11, 2023, DN 84-3).

The facts regarding the pertinent chain of events have been summarized in a document ("Combined Timeline" or "Timeline") prepared by OPD Major Michael Staples ("Staples"). (Defs.' Mem. Supp. Mot. Summ. J. Ex. E, DN 83-5).  Staples created the Combined Timeline by reviewing audio from: (1) 911 calls made by Dana and Kyle; (2) the "radio traffic audio of [OPD] Dispatch"; and (3) a Nest Doorbell video recording provided by Dana's neighbor, which "appears to be a true and accurate record of what occurred that day and is consistent with some of the parties' statements made to [Staples]" during his interviews with them.[2]  (Staples Aff. ¶¶ 5-6, DN 105). Defendants rely extensively on the facts summarized in the Combined Timeline in support of their motion.  (Defs.' Mem. Supp. Mot. Summ. Summ. J. 3, 5-6, 10, DN 83).  Dana's expert witness, William D. Fryer ("Fryer"), also reviewed the Timeline when preparing his report.  (Fryer Expert Report, DN 70-1).  Because the Combined Timeline appears to present an accurate representation of the events as they unfolded, it will be accepted as an accurate chronology.

Around 10:00 a.m. that morning, Kyle arrived in his SUV at Dana's residence, parking in the driveway.  (D. Little Dep. 19:10-15).  Kyle approached Dana's front door, asking for the whereabouts of another individual named Tyler English ("English"), whom Kyle mistakenly believed would be at Dana's residence.  (D. Little Dep. 19:4-9; Dunn Dep. 31:2-18).[3]  Dana claims neither she, nor her 23-year-old son Keon who lived with her, knew Kyle before this interaction.

---

[2] The Court has received a copy of the Nest Doorbell video recording, and the recording appears to be consistent with the Combined Timeline.  (*See* Nest Video Recording, DN 104).

[3] Defendants assert that Kyle "mistakenly pulled into the driveway and knocked on the door of the Littles' house looking for Tyler English, a man who lived across the street."  (Defs.' Mem. Supp. Mot. Summ. J. 2, DN 83-1).  Dana refers to English as "an individual who was not related to [the Littles] and did not live [at Dana's residence]."  (Compl. ¶ 8).

(D. Little Dep. 81:16-20).   Another individual, Kobey Morgan ("Morgan"), was inside Dana's house when Kyle inquired about English's whereabouts.   (D. Little Dep. 19:16-21).   After Kyle returned to his vehicle, Morgan went outside, and the two began to argue.   (D. Little Dep. 19:19-20:11).   At some point, Kyle moved his vehicle from Dana's driveway to the street in front of her house.   (Dunn Dep. 38:4-10).   Soon after, Dana and Keon joined Morgan outside and the argument continued.   (D. Little Dep. 20:21-21:18, 26:10-17).   Dana and Keon demanded that Kyle leave their property, but he refused.   (D. Little Dep. 27:3-19; K. Little Dep. 35:15-25, May 25, 2023, DN 84-4).   Dana damaged Kyle's car with a baseball bat.   (D. Little Dep. 27:11-19).   Keon shouted profanities, spat at, and threatened to shoot Kyle.   (K. Little Dep. 37:16-38:10).[4]   Kyle, from inside his vehicle, also threatened to harm Dana and Keon.   (K. Little Dep. 35:17-21, 38:17-21).   Around 10:10 a.m., Kyle called OPD requesting police to the scene, stating that "[Dana and Keon] were at his window with a bat" and that Keon was "threatening to shoot" him.   (Combined Timeline 10:10:34).   Kyle also claimed that Keon "busted his window with his fist."   (Combined Timeline 10:10:34).

Dunn and Hammonds were both dispatched to Dana's residence.   (Combined Timeline 10:12:28).   They were advised that a Black female had hit Kyle's car with a baseball bat and that she was then screaming at Kyle from outside his vehicle.   (Combined Timeline 10:12:28).   A neighbor also called OPD around this time to report the confrontation.   (Combined Timeline 10:11:15).   At 10:13 a.m., Dana called OPD, requesting officers to remove Kyle from her residence.   (Combined Timeline 10:13:18).   In her 911 call, Dana claimed that Kyle "was gonna run [her] over with his car" and "got out of the car on [Dana]."   (Combined Timeline 10:13:18).

---

[4] Keon testified in his deposition that he did not own a gun, and that this statement was a bluff to attempt to get Kyle off his property.   (K. Little Dep. 38:11-16 (stating "No.  I didn't own a gun. You know, just talking out my neck.")).

Dana stated, "[Kyle] does not live here and I want him gone, off of my property, or I'm gonna sick both of my dogs on him." (Combined Timeline 10:13:18). Dunn arrived at 10:17 a.m. and immediately began questioning Kyle before addressing Dana and Keon. (Dunn Dep. 22:23-23:13). Dana and Keon took offense to this action and believed Dunn's actions were racially motivated. (Dunn Dep. 77:4-10).

Dana and Keon began yelling obscenities at Dunn and Kyle, and Dunn told Keon to return to the house, warning him that if he did not stop yelling he would be arrested for disorderly conduct. (D. Little Dep. 40:4-41:15; Dunn Dep. 45:1-6). Keon turned to go into the house, but as he was walking he uttered one last expletive directed towards Dunn. (Dunn Dep. 45:7-11; K. Little Dep. 46:6-16). Dunn, attempting to arrest Keon, ran after him towards the house and attempted to enter. (Dunn Dep. 47:17-4817; K. Little Dep. 54:15-24). Dana shut her glass storm door on Dunn's arm to try to stop him from entering her home,[5] at which point Dunn told Dana she was under arrest for hindering prosecution. (Dunn Dep. 49:14-50:5, 108:20-109:8). A struggle ensued between Dunn and Dana which resulted in both falling to the ground, dislocating Dana's elbow.[6]

---

[5] Dana does not recall whether Dunn's arm was caught in the door during this interaction. (D. Little Dep. 44:6-8 ("Q: You didn't close [the door] on [Dunn's] arm? A: Not to my knowledge.")). This fact, however, is immaterial to the resolution of the pending motions.

[6] The parties disagree as to whether Dunn intended to force Dana to the ground after putting her in a holding position. Although there is agreement that Dunn put Dana in a "straight arm bar" hold, how this position transitioned into an "arm bar takedown" and caused Dana's injury remains in dispute. (*See* Pl.'s Mot. Part. Summ. J. 4; *see also* Defs.' Mem. Supp. Mot. Summ. J. 12). Dana contends that "Dunn chose to apply a straight arm bar takedown to [Dana] in an environment that made injury foreseeable" and that her injury "occurred as a consequence of Dunn's decision to unnecessarily and unreasonably escalate that [the armbar hold] by taking [Dana] to the ground." (Pl.'s Mot. Partial Summ. J. 4, 14-15). Defendants maintain that "when [Dunn] applied the arm bar to [Dana], he didn't throw her to the ground . . . ." (Defs.' Reply Mot. Summ. J. 1). Defendants rely on Dunn's deposition statement that "[t]he arm bar takedown is supposed to be pretty much a graceful as can be maneuver to the ground. Us losing our balance is the only reason her arm was dislocated." (Defs.' Reply Mot. Summ. J. 1 (quoting Dunn Dep. 87:1-5)). Indeed, Dunn testified that "when [Dana] lost her balance, it pulled [him] with her." (Dunn Dep. 87:15-16).

(Dunn Dep. 58:5-18).  By this point Hammonds had arrived at Dana's residence and began to run towards the house.  (Hammond Dep. 8:13-9:1, May 25, 2023, DN 77-2).  Dana and Keon were placed under arrest and an ambulance took Dana to a nearby hospital.  (Dunn Dep. 67:18-22, 70:6-12).  All of these events occurred within three minutes after Dunn arrived at Dana's residence.  (Combined Timeline 10:17:43-10:20:10).

Keon pleaded guilty to disorderly conduct (second degree).  (K. Little Arrest Citation, DN 25-2; Pls.' Mot. Voluntary Partial Dismiss).  Dana was charged with disorderly conduct (second degree), hindering prosecution or apprehension (second degree), and criminal mischief (first degree).  (D. Little Arrest Citation, DN 27-1).  In this action, Dana sued Dunn, Ealum, and the City for malicious prosecution, denial of due process, and unreasonable and excessive force "in violation of the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. Sec. 1983" (collectively, "Section 1983 Claims").  (Compl. ¶¶ 23-25).  Dana also asserted state law claims for malicious prosecution, assault, and battery.  (Compl. ¶¶ 26-27).

Dana has moved for partial summary judgment on Dunn's liability (DN 78).  Defendants have moved for summary judgment on all claims (DN 82).  Additionally, Defendants have moved to exclude testimonial evidence of Fryer (DN 79) and opinion evidence from Dana's medical providers (DN 80).  Each of these motions is addressed below.

## II.    <u>JURISDICTION</u>

The Court has subject-matter jurisdiction because a federal question is presented.  *See* 28 U.S.C. § 1331.  In addition, the Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

## III.    DISCUSSION

### A.    Motions for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party moving for summary judgment may satisfy its burden [of] show[ing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'"  *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  Similarly, the movant may meet its burden by offering evidence negating an essential element of the non-moving party's claim.  *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case," or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  "The mere existence of a scintilla of evidence in support of the [moving party's] position [is] [ ] insufficient; there must be evidence on which the jury could reasonably find for the [moving party]."  *Anderson*, 477 U.S. at 252.

Dana brought Section 1983 claims as well as state law claims against Dunn; however, she did not state whether she was suing Dunn in his official or individual capacity.  (*See* Compl. ¶¶

23-25).  To the extent that the individual state employees are sued in their official capacities, this "is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (citation omitted).  Therefore, Dana's official capacity claim against Dunn is duplicative of her claim against the City. The following sections will analyze Dunn's potential individual liability.

### 1.   *Section 1983 Claims*

Dana and Defendants filed dueling motions for summary judgment regarding Dunn's liability (DN 78; DN 82).  Dana argues that Dunn  should be held liable as a matter of law for using unreasonable and excessive force by "taking Plaintiff to the ground."  (Pl.'s Mot. Partial Summ. J. 14-15).[7]  Defendants assert the affirmative defense of qualified immunity, contending that Dunn "used a soft hand technique in trying to handcuff" Dana that was reasonable given Dana's active resistance to being arrested.  (Defs.' Mem. Supp. Mot. Summ. J. 9).  As the Sixth Circuit has instructed, summary judgment is the correct stage of the litigation to determine a qualified immunity defense.  *See Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015).

### a.   Qualified Immunity

Section 1983 does not provide substantive rights to a plaintiff but creates a mechanism for a remedy when there is a deprivation of a constitutional right or an otherwise established right.

---

[7] Dana also claims that she and Keon "were and continue to be subjected to malicious prosecution, unsupported by any probable cause, and denied due process of law in violation of the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. §1983."  (Compl. ¶ 23).  Neither Dana nor Defendants address a Section 1983 claim for malicious prosecution in their motions for summary judgment.  (*See* Defs.' Mot. Summ. J.; Pl.'s Mot. Partial Summ J.).  Regardless, Dana has not stated an adequate claim for malicious prosecution under Section 1983, as she has not provided facts that she "obtained a favorable termination of [her] underlying criminal prosecution."  *See Thompson v. Clark*, 596 U.S. 36, 39 (2022).  Thus, summary judgment is granted for Defendants on the Section 1983 malicious prosecution claim.

*See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). The Supreme Court has held that qualified immunity generally shields "government officials performing discretionary functions . . . for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982) (citations omitted). Defendants argue that qualified immunity applies to Dunn's conduct because he used reasonable force and no clearly established law indicates his actions violated a constitutional right. (Defs.' Mem. Supp. Mot. Summ. J. 11-12). The Sixth Circuit has explained when qualified immunity applies to an officer's actions:

> Qualified immunity will ordinarily apply unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful. The qualified immunity analysis is a two-step inquiry: (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order. The clearly established step asks whether existing precedent placed the conclusion that the defendant violated the constitution under the circumstances beyond debate.

*Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (internal quotation marks omitted) (internal citations omitted) (citation omitted).

A plaintiff has the burden of showing a defendant is not entitled to qualified immunity when a defendant raises the initial qualified immunity defense. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted). A defendant must first provide facts showing that the actions taken were within his or her discretionary authority. *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *7 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). In this case, Defendants state that the "determination of the amount of force required [when making an arrest] is a discretionary act" consistent with Sixth Circuit precedent. (Defs.' Mem. Supp. Mot. Summ. J. 12 (citing *Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014)); *see Reich v. City of Elizabethtown*, 945

F.3d 968, 982 (6th Cir. 2019) (citing *Nichols*, 26 F. Supp. 3d at 642) (citation omitted).  In this case, therefore, Dunn's determination regarding the amount of force to use when arresting Dana constituted a discretionary act.

### i.        Violation of a Constitutional Right

Qualified immunity analysis begins by determining what constitutional rights may be implicated in the given case and the extent of the potential violation.  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (citations omitted).  Dana's Section 1983 claim against Dunn is based on the Fourth Amendment right against unlawful searches and seizures.  (*See* Pl.'s Mot. Partial Summ. J. 1).  The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . ." U.S. Const. amend. IV.  These Fourth Amendment protections include a safeguard against an officer using excessive force during an arrest or a stop.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  A court utilizes the "objective reasonableness" standard when evaluating such an excessive force claim.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (citing *Graham*, 490 U.S. at 396).  This test asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 387 (citation omitted).  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396 (citation omitted).

A court undergoes this analysis by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (citation omitted).  It requires assessing the following factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade

arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). When examining these factors, a court must identify a seizure and determine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)).

Applying the *Graham* factors to Dunn's conduct, it is likely that he did not violate Dana's Fourth Amendment Rights. Regarding the first factor—severity of the crime at issue—Dunn told Dana she was under arrest when she blocked his entrance into her house. (Nest Video Recording 20:40-50, DN 104; Combined Timeline 10:19:00). "Courts may consider a number of factors to evaluate the severity of the crime at issue such as the classification of the offense, whether there was any 'connotation of violence' by the plaintiff, the reason the police were called to the scene, and public safety concerns." *Johnson v. Smith*, No. 5:21-CV-00187-GNS-LLK, 2024 WL 1329925, at *4 (W.D. Ky. Mar. 27, 2024) (citing *Shumate v. City of Adrian*, 44 F.4th 427, 440-42 (6th Cir. 2022)). It is not clear from the recordings the crime for which Dunn placed Dana under arrest, but he has testified that the crime was "hindering prosecution" and there is no dispute that there was a threat of violence, despite the fact Keon testified he was bluffing when he threatened to shoot Kyle. (*See* Nest Video Recording 20:40-50; Combined Timeline 10:19:04; Dunn Dep. 108:20-109:8; K. Little Dep. 37:16-38:16).[8] Because Dana was hindering the apprehension of Keon, who was being arrested for disorderly conduct (i.e., a misdemeanor), her actions would constitute hindering prosecution in the second degree, which is a Class A misdemeanor. *See* KRS 520.130, 525.060. Although this crime is not very severe, it is clear that Dunn had the right to arrest Dana under these

---

[8] Dana testified that Dunn told her he would "arrest [her] for disorderly conduct." (D. Little Dep. 44:12-14). Dunn testified that he "[doesn't] know that [he] said what the charge was, but [he knows he] told her she was under arrest." (Dunn Dep. 89:14-16).

circumstances.  (D. Little Dep. 43:12-17; Dunn Dep. 110:8-13).  She was actively blocking Dunn's

pursuit of Keon by pushing against the door to her house so that he could not enter.  (D. Little Dep.

43:12-17; Dunn Dep. 110:8-13).  Dana claims she told Dunn that "he couldn't go into [her] home

without a warrant."  (D. Little Dep. 43:15-16).  Given Dunn's impression that Keon might have

been retrieving a gun from the house, it is not objectively unreasonable for an officer in Dunn's

position to believe he could lawfully enter the house under these exigent circumstances.  *See*

*O'Brien v. City of Grand Rapids*, 23 F.3d 990, 1000 (6th Cir. 1994) (holding that defendant officers

were entitled to qualified immunity when a reasonable officer "could conclude that there were

exigent circumstances excusing the requirement that a warrant be obtained" before entering the

plaintiff's home); (Dunn Dep. 11:18-111:4).  Therefore, the first *Graham* factor weighs in favor of

finding that Dunn's actions were objectively reasonable.

        This directly leads to the second factor—whether the suspect posed an immediate threat.

*Graham*, 490 U.S. at 396.  A reasonable officer could conclude that Dana posed an immediate threat

to Dunn or the other officers.  Dana claims that "there was no evidence that [she] or her son posed

any threat to the safety of Dunn, Hammonds, or anyone else" because they were both "unarmed

and did not threaten the officers."  (Pl.'s Mot. Partial Summ. J. 13).  This argument ignores the fact

that Dunn was told there was possibly a gun in the house from information he received on the "radio

call on the way [to Dana's residence]."  (Dunn Dep. 51:1-8).  It is inconsequential whether Dana or

Keon were actually armed, as the test for objective reasonableness only considers the officer's

perspective at the time of the incident, without the benefit of hindsight.  *Graham*, 490 U.S. at 387

(citation omitted).  Based upon his knowledge at the time, Dunn did not know if Keon was retrieving

a gun inside the home but was certainly aware of the potentially escalating conflict among Dana,

Keon, and Kyle.  (Dunn Dep. 107:21-108:2).  Thus, a reasonable officer in this situation could determine that Dana's blocking the entry into her home posed an immediate threat.

The third *Graham* factor—a person actively resisting arrest—also weighs in favor of finding qualified immunity.  Defendants claim that "[w]hen [Dunn] reached for [Dana's] arm so he could place her in handcuffs, she resisted his efforts, even after he warned her to stop resisting."  (Defs.' Mem. Supp. Mot. Summ. J. 5 (citing Dunn Dep. 58:12-15)).[9]  In contrast, Dana contends that she "was not attempting to evade arrest by flight;" because only four to five seconds elapsed between her blocking the doorway and Dunn's arm bar restraint, Dana asserts that there was "little to no time for Dunn to issue any instructions or warnings to [Dana], or for her to comply."  (Pl.'s Mot. Partial Summ. J. 14).  The Nest Doorbell video recording, however, indicates that Dana expressly resisted Dunn's commands.  (*See* Nest Video Recording 20:40-58;Combined Timeline 10:19:00-17).  The recording clearly demonstrates that Dana responded, "no I'm not" when Dunn told her she was under arrest.  (Nest Video Recording 20:40-45; Combined Timeline 10:19:00-01).  Dunn can be heard yelling, "give me your hands", "turn around", and "stop resisting".  (Nest Video Recording 20:45-55; Combined Timeline 10:19:07-17).  Throughout these commands, Dana can be heard arguing with Dunn, yelling "you serious" and "for what . . . I didn't do nothing."  (Nest Video Recording 20:40-58; Combined Timeline 10:19:04-10).

Dana argues that because the altercation only lasted a few seconds, there was "no time for Dunn to warn [Dana] that she would be subjected to force or arrested if she didn't get out of his

---

[9] Dana refutes that Dunn tried to put her in handcuffs.  (D. Little Dep. 43:2-6 (stating that "[Dunn] didn't ever have any handcuffs in his hand.")).  This is not inconsistent with Dunn's testimony, as he simply claimed that he grabbed Dana's arm and that, after Dana and Dunn hit the ground, the officers "were going to handcuff her" before realizing her arm was injured.  (Dunn Dep. 80:17-22).  Dana does not deny that Dunn grabbed her wrist before putting her in the arm bar hold.  (*See* D. Little Dep.  44:21-24).

way . . . ." (Pl.'s Mot. Partial Summ. J. 14). This short interval in which officers must make difficult decisions is a key component of the reasonableness analysis: "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Dickerson*, 101 F.3d at 1162 (quoting *Graham*, 490 U.S. at 396-97). *Graham* instructs courts not to "allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."). Given that Dana was hindering Dunn's pursuit of Keon, it was not unreasonable for an officer in Dunn's position to use force to neutralize Dana's obstruction. For these reasons, it is not likely that Dunn violated Dana's Fourth Amendment rights.

### ii.    Clearly Established Constitutional Right

Even if Dana could demonstrate that Dunn violated her Fourth Amendment rights, she must also show that this right was clearly established to overcome qualified immunity. *Getz*, 833 F.3d at 652. The "salient question in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (internal quotation marks omitted) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2022)). Indeed, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) (citation omitted). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Getz*, 833 F. 3d at 652 (quoting

*Johnson*, 790 F.3d at 653 (citation omitted)).  The unlawfulness of an officer's actions 'can be "clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (citing *Hope*, 536 U.S. at 739).

The Sixth Circuit has held that "right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504 (6th Cir. 2001) (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir.1993)).  In this case, Dana argues that Dunn's force was excessive when he "unnecessarily and unreasonably escalate[d] th[e] use of force by taking [Dana] to the ground." (Pl.'s Mot. Partial Summ. J. 14-15).  Dana contends it was not the "straight arm bar pain compliance technique" that caused Dana's injury, but Dunn's subsequent maneuver into a "straight arm bar takedown." (Pl.'s Mot. Partial Summ. J. 4, 14).  Although Defendants contest that Dunn used the arm bar takedown technique, they argue "[a]n arm-bar takedown is a standard police procedure." (Defs.' Mem. Supp. Mot. Summ. J. 9 (citing *Fox v. DeSoto*, 489 F.3d 227, 236-37 (6th Cir. 2007))).

It does not matter in this instance whether Dunn intended to use this takedown technique, because Dana has failed to demonstrate that, even if he did, Dunn's actions would constitute excessive force.  Dana points to two main sources supporting a finding that the arm bar takedown constituted excessive force:  (1) the *Graham* factors and (2) OPD's own policies.  (Pl.'s Resp. Defs.' Mot. Summ. J. 5, DN 88).  This first position is without support.  The Court has already determined that the *Graham* factors weigh against a constitutional violation.  Regarding her second argument, Dana posits that it is OPD policy that straight arm bar takedowns "should occur only if the subject continues to resist after the arm bar is applied." (Pl.'s Mot. Partial Summ. J. 3-4 (citing OPD Training Materials, DN 78-7)).  This point, however, also lacks merit.  As The Sixth Circuit

has held, "[u]nder § 1983, the issue is whether [an] [officer] violated the Constitution, not whether he should be disciplined by the local police force." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (finding that whether an officer "may have violated [a city's] policies regarding police use of force" was immaterial to the qualified immunity analysis). In *Smith*, the court determined that the proper approach in determining excessive force does not "consider[] these local rules[;]" rather, the court should "limit[] its attention to whether the officer had violated" the standard set forth by Supreme Court precedent. *Id.* at 348.

In the current case, Dana points to no Supreme Court or Sixth Circuit authority establishing that the use of an arm bar takedown technique under similar circumstances constitutes excessive force. Dana cites *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013), in which the court found that an officer's use of force was unreasonable when, faced with an unarmed and distraught individual, the officer did not first attempt to "de-escalate the situation and reduce the level of force needed to gain control" before tackling the individual. *Id.* at 958. That case, however, presents a much different fact pattern than the one at hand, as Dunn testified that he thought Keon may have been retrieving a gun, and this rationale justified his use of force in removing Dana from the doorway. (Dunn Dep. 110: 18-21 ("Q: Why didn't you step back and give yourself time to think? A: Because Keon was in the house, possibly with a gun.")). The fact that officers must make split-second determinations must be considered in the qualified immunity analysis. *See Dickerson*, 101 F. 3d at 1162. *Martin* is not applicable to the case at hand, as the officer in that case was not faced with similar exigent circumstances. *Martin*, 712 F. 3d at 958.

Dana also cites *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012), in which the Tenth Circuit held an officer was not entitled to qualified immunity when he used a forceful takedown maneuver against a suspect. *Id.* at 1198. That case is also distinguishable as the suspect there "posed no

threat to [the officer] or others, nor did he resist or flee." *Id.* In the current case, a reasonable officer could have determined that Dana posed a threat because she was blocking the entryway into the house where Keon may have been retrieving a gun. (*See* Dunn Dep. 110:18-21). The objective reasonable standard "gives ample room for mistaken judgments" and provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986). It was not objectively unreasonable for an officer in Dunn's position to apply an arm bar takedown maneuver to Dana when she blocked the entrance to her house and refused to comply with his commands. Faced with the threat of a potentially armed suspect inside the house, Dunn's actions do not reflect the behavior of a "plainly incompetent" officer, nor one who "knowingly violate[d] the law." *Id.* at 341.

Police officers must often make snap decisions in complex environments, and it is not evident here that "any reasonable official in [Dunn's] shoes would have understood that he was violating [Dana's constitutional rights]." *Plumhoff*, 572 U.S. at 778-79 (2014) (citation omitted). Given the facts of this case, it cannot be said that Dunn had "'fair warning' that [his] conduct was unconstitutional." *Guertin*, 912 F.3d at 932 (6th Cir. 2019) (internal quotation marks omitted) (citation omitted). Dunn's use of force, therefore, was not unreasonable under these circumstances, and he did not violate a clearly established constitutional right of Dana.

Both prongs of the qualified immunity analysis—"violation of a constitutional right" and "clearly established"—indicate that Dunn is protected by qualified immunity for his actions in this case. No other facts remain in dispute to materially alter this finding. As such, Dana's motion is

denied, and Defendants are entitled to summary judgment on the Section 1983 claims against Dunn.

### 2.      *State Law Claims*

There appears to be some confusion regarding Dana's state law claims.  In her Complaint, Dana brings one claim of malicious prosecution under "state common law rights and KRS 503.055" (i.e., Count II) and one claim of assault and battery (i.e., Count III).  (Compl. ¶¶ 27-27). There is no mention of a negligence claim in the Complaint, other than Dana describing Defendants' conduct as "objectively unreasonable, intentional and grossly negligent . . . ." (Compl. ¶ 7).  One other mention of "grossly negligent" conduct can be found in Dana's Section 1983 claim.  (Compl. ¶ 23).  This broad description hardly amounts to bringing a cause of action. In contrast, Dana states in her partial summary judgment motion that Dunn "should be held liable for the consequences of his negligence."  (Pl.'s Mot. Partial Summ. J. 15).  Defendants respond by stating that Dunn is entitled to "qualified official immunity on [Dana's] state claim of negligence." (Defs.' Resp. Pl.'s Mot. Partial Summ. J. 1, DN 90).  Dana specifies neither malicious prosecution nor assault/battery in her motion.  (*See* Pl.'s Mot. Partial Summ. J.).  Defendants, in their summary judgment motion, do address malicious prosecution and assault/battery, asserting that Dana's state law claims "are all founded in tort, and these claims are barred by qualified official immunity." (Defs.' Mot. Summ. J. 12).

Defendants correctly note that a finding of qualified official immunity would shield Dunn from liability regarding Dana's state law claims, regardless of whether she successfully pleaded negligence.  *See Gati v. W. Ky. Univ.*, 762 F. App'x 246, 253 (6th Cir. 2019) (stating that qualified official immunity applies to both negligence and intentional torts).  Under Kentucky law, the defense of qualified official immunity is "unavailable in a malicious prosecution action . . . ."

*Martin v. O'Daniel*, 507 S.W.3d 1, 5 (Ky. 2016). This is because "[m]alice is a material fact that a plaintiff must prove to sustain a malicious prosecution claim" and "qualified official immunity is available only to officials acting in good faith" *Id.* (citations omitted). As the Sixth Circuit has stated, "[t]he issue of qualified official immunity is superfluous" to a claim for malicious prosecution— "if the plaintiff cannot prove malice, the officer needs no immunity." *Clemons v. Couch*, 768 F. App'x 432 (6th Cir. 2019) (quoting *Martin*, 507 S.W.3d at 5-6); *see also Martin*, 507 S.W.3d at 5 ("Acting with malice and acting in good faith are mutually exclusive."). Therefore, although the defense of qualified official immunity is not available for the malicious prosecution claim, a finding that Dunn did not act with malice under the qualified immunity analysis would necessitate a finding that he is also not liable for malicious prosecution.

Under Kentucky law, public officials and employees have qualified official immunity from tort liability for "(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). Qualified official immunity protects officials who must exercise judgment and discretion from personal liability for damages in order to encourage the full performance of their necessary duties. *New v. Louisville Metro Gov't*, No. 3:15-cv-653-DJH, 2016 WL 1268299, at *4 (W.D. Ky. Mar. 30, 2016) (citing *Haney v. Monsky*, 311 S.W.3d 235, 245 (Ky. 2010)). It has already been determined that Dunn was performing a discretionary function in his use of force against Dana. *See Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014) (stating that discretionary acts are those which "call[] for a 'good faith judgment call[] made in a legally uncertain environment.'" (quoting *Yanero*, 65 S.W.3d at 522)). Furthermore, Dunn's actions in apprehending Dana were clearly within the scope of his authority,

as he was called to the scene as part of his police duties and used physical force that he believed was "necessary to effect [Dana's] arrest." *See* KRS 503.090(1)(a).

Because Defendants have demonstrated that that Dunn was acting within his discretionary authority, Dana has the burden "to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523 (citation omitted). Under Kentucky law, the "good faith" component of qualified official immunity has "both an objective and subjective aspect." *Id.* (citing *Harlow*, 457 U.S. at 815). The objective aspect asks whether there was a "violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Id*. This test mirrors the objective reasonableness standard of the qualified immunity analysis above, and it has already been determined that Dunn did not violate a clearly established constitutional right.

The other component of determining bad faith is the subjective test, which asks whether "the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* (citation omitted). Defendants argue that "Dunn did not act with malice or any corrupt motive" and that "[Dana] relies solely on her speculation and her assertions that [] Dunn intended to injure her by the manner in which Dunn attempted to effect her arrest." (Defs.' Mot. Summ. J. 13). Dana does not offer specific evidence regarding Dunn's intent to harm her but asserts only that Dunn intended to bring her to the ground. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 2-3). This argument does not implicate "willfull[] or malicious[] inten[t]" nor "corrupt motive" on behalf of Dunn to intentionally injure Dana. Dana has failed, therefore, to demonstrate that Dunn acted in bad faith.

Because Dunn was performing (1) a discretionary function (2) in good faith (3) within the scope of his authority, his actions are protected by qualified official immunity under Kentucky law. *See Howell*, 668 F.3d at 355 (citation omitted). He therefore cannot be found liable on the assault/battery claim. Furthermore, because Dana has failed to demonstrate bad faith (i.e., malice), Dunn also cannot be liable for malicious prosecution. Accordingly, Dana's motion is denied, and Defendants' motion is granted as to the state law claims asserted against Dunn.

### B.   Summary Judgment on Remaining Claims

#### 1.    *Section 1983 Claims against Ealum and the City*

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), municipalities can be held liable for constitutional violations caused by an official policy. *Id.* at 690-91. A plaintiff bringing a *Monell* claim must show that: (1) his or her rights were violated; and (2) the municipality was responsible for the violation. *See Doe v. Claiborne Cnty. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 505-06 (6th Cir. 1996). In the current case, Dana failed to demonstrate that her rights were violated, as the Court has granted summary judgment for Defendants on all claims against Dunn. "[A] municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 900 (6th Cir. 2004) (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)). Because Dunn did not commit an underlying constitutional violation, there can be no *Monell* liability for Ealum or the City. The Court, therefore, grants summary judgment for Defendants on the Section 1983 claims against Ealum and the City.

#### 2.    *State Law Claims against Ealum and the City*

For state law claims, "[t]he doctrine of respondeat superior applies to the liability of a municipality the same as it does to any other corporation or individual . . . ." *White v. Deghetto*,

No. 5:09-CV-139, 2010 WL 5419056, at *10 (W.D. Ky. Dec. 23, 2010) (citing *Ellis v. Jordan*, 571 S.W.2d 635, 638 (Ky. App. 1978)).  In the current case, Dana seeks to hold the City and Ealum vicariously liable for the actions of Dunn, stating they are "responsible for the training, supervision and conduct of, the officers and employees of the OPD." (Compl. ¶¶ 4-5).[10]  Similar to the Section 1983 claims, Defendants argue that "[i]f [] Dunn did not use unreasonable force in his efforts to arrest [Dana] [] and did not violate any of her constitutional rights, then [] Ealum and the City have no liability to her on her claims that they failed to train or supervise Dunn." (Defs.' Mem. Supp. Mot. Summ. J. 13).  Dana rebuts this contention by asserting that "the question of whether Dunn violated [Dana]'s rights is at least an issue that a jury must resolve, [so] Defendants Ealum and the City are not entitled to summary judgment . . . ." (Pl.'s Resp. Defs.' Mot. Summ. J. 10).  The Court already determined above that Dunn did not violate Dana's constitutional rights, which renders Dana's argument moot.  Under Kentucky law, there can be no respondeat superior liability if "no tort liability attaches to [the] [underlying officer's] actions." *See White*, 2010 WL 5419056, at *10; *see also Haugh v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. App. 2007) ("Indeed, vicarious liability is not possible without primary liability." (citing *City of Louisville v. Bergel*, 610 S.W.2d 292, 293 (Ky. 1980))).  Because Dunn is not liable for the state law claims of malicious

---

[10] Although Dana does not use the terms "respondeat superior" or "vicarious liability" in her Complaint, the Court assumes this is her theory of liability for Ealum and the City.  The Complaint does not tie the actions of Ealum, nor a policy of the City, to either of her state tort claims for malicious prosecution and assault/battery. (*See* Compl.).  Dana does make a general allegation that Dunn's "flagrant misconduct . . . evidences a failure by Defendants Owensboro and Ealum to properly train and supervise such Defendants in the clearly-established law limiting their use of force and power." (Compl. ¶ 20).  This language appears directed to Dana's Section 1983 claims, although she does not mention a failure to train claim under that cause of action. (*See* Compl. ¶¶ 21-25).  Regardless, Dana does not provide a specific cause of action under Kentucky law for which Ealum and the City would be directly liable.

prosecution and assault/battery, neither Ealum nor the City cannot be held liable under a theory of respondeat superior.  Summary judgment is granted for Ealum and the City on the state law claims.

 **C.** **Defendants' Motions to Exclude**

 The Court has granted summary judgment for Defendants on all claims.  Because an order granting summary judgment is a final decision on the merits, it is unnecessary to consider the merits of Defendants' Motions to Exclude.  *See Carpenter v. Liberty Ins. Corp.*, 850 F. App'x 351, 352 (6th Cir. 2021).  These motions are denied as moot.

**V.** **CONCLUSION**

 For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

 1. Plaintiff's Motion for Partial Summary Judgment (DN 78) is **DENIED**.

 2. Defendants' Motion for Summary Judgment (DN 82) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

 3. Defendants' Motions to Exclude (DN 79, 80) are **DENIED AS MOOT**.

 4. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

January 31, 2025

cc: counsel of record